T #
AMOUNT $ 250.00
SUMMONS ISSUED ✓
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. ___
DATE 2/23/2006

**06 CA 10337 NMG**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2006 FEB 23 P 3: 35

U.S. DISTRICT COURT
DISTRICT OF MASS.

)
JOLT ONLINE GAMING LIMITED,   )
    Plaintiff,   )
)
v.   )
)    CIVIL ACTION NO: _____
)
TURBINE, INC., f/k/a TURBINE   )
ENTERTAINMENT SOFTWARE   )
CORPORATION,   )
)
    Defendant.   )
)    MAGISTRATE JUDGE _____

## COMPLAINT

This is an action for breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, quasi-contract, fraud, in equity for reliance, and unfair and deceptive business practices under M.G.L.c. 93A. The Plaintiff seeks equitable relief and money damages.

### Parties and Jurisdiction

1.    Plaintiff, Jolt Online Gaming Limited ("Jolt"), is a foreign company registered in England with its principal place of business in Bracknell, England, United Kingdom.

2.    Defendant, Turbine, Inc., f/k/a Turbine Entertainment Software Corporation ("Turbine"), is a Delaware Corporation with its principal place of business in Westwood, Massachusetts.

3.    Pursuant to 28 U.S.C. §1332, this Court has jurisdiction over this matter based on the diversity of citizenship of the parties and that the matter in controversy exceeds $75,000 exclusive of interest and costs.

4.    Venue in this district is proper in that a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in Massachusetts.

981744v5

## Facts

5. Jolt is a leading provider of online gaming services in Europe.

6. Turbine is a world-wide provider of online subscription entertainment, including online computer games. The company is the largest privately-held online games studio in North America and is the creator of the massively multiplayer online role-playing game ("MMORPG") known as Asheron's Call ("AC1") and its sequel, Asheron's Call 2: Fallen Kings ("AC2").

7. MMORPGs appeal to a very specific kind of online game player. Because there is no start or end to the game experience, game players pay a monthly subscription fee in order to access the MMORPG for an unlimited number of hours each month. As players interact with the game environment, they are able to meet other players and form groups and alliances to achieve common goals. Games often offer additional support and help for game user groups which form in these games.

8. This social aspect of the game is the heart of an MMORPG. Accordingly, in order to create and maintain the richness of the social dynamics offered by an MMORPG, such a game requires the simultaneous participation of literally thousands of online players.

9. AC1, launched in 1999, is a 3-D MMORPG that brings players into the magical realm of Dereth, where players can battle monsters and form alliances in a vast land containing hills, mountains, deserts, forests, towns and dungeons. AC2, launched in 2002, marks the first sequel to a 3-D MMORPG. The Asheron's Call franchise is best known for its thriving online communities and rich episodic updates that add new game features and storyline content to the games on a regular basis.

981744v5

10. The technical issues of allowing access, connectivity and customer support to online players so that the gaming experience appears seamlessly universal to all, requires the operation of a number of network servers. It is common for such servers to be dedicated to online player sub-groups based upon those players' physical location. For example, online players in the United States and Canada may access certain network servers located in the United States, while players in Europe will access network servers established in Europe.

11. In 2003, Turbine approached Jolt with the possibility to offer AC1 and AC2 to online game players in Europe.

12. Jolt's objective in entering into the proposed relationship with Turbine was to expand its presence in the gaming world with respect to the offering of MMORPG games to European online players, and to expand its base of online customers. Jolt was aware that AC1 and AC2 had attained a great deal of popularity due to, in part, the continuing development of those games and the high level of customer support provided to the players of those games.

13. Over the next several months, an agreement to license the distribution rights to AC1 and AC2 was negotiated between representatives of Jolt and Turbine.

14. Jolt and Turbine entered into a License Agreement (the "Agreement") on August 26, 2004. A true and correct copy of the Agreement is attached hereto as Exhibit "A".

15. Jolt entered into the Agreement in reliance upon representations by Turbine to Jolt executives in approximately March or April 2004 that Turbine already had between 5,000 and 10,000 subscribers in Europe. Those representations, some of which were contained in e-mails forwarded from Turbine's Executive Director, International Business, were in response to questions posed by Jolt for the purpose of evaluating the proposed business relationship.

Turbine's executives were aware of the reasons for Jolt's questions and understood that Jolt would rely upon Turbine's responses in making the decision whether to enter into a license arrangement.

16. Jolt learned after entering into the Agreement that there were substantially fewer European subscribers than represented by Turbine, and that Turbine knew that it did not have enough players in Europe to be commercially viable.

17. The Agreement provided an initial term of three (3) years for said distribution, including a commercial launch of AC1 and AC2, as well as migration of the billing responsibilities from Turbine to Jolt, which were to be accomplished on or prior to the first anniversary of the effective date of the Agreement, or August 26, 2005.

18. As Jolt began working with Turbine to complete the billing migration, problems with Turbine began. Jolt exercised its best efforts to complete the billing migration, including offering to purchase and install the same software used by Turbine. The problems with the billing migration were Turbine's sole responsibility.

19. The billing migration required the parties to exchange technical data and billing information with one another. Without Turbine's cooperation, the billing migration could not occur. Jolt made numerous requests to Turbine for the required technical information needed to complete the billing migration. Turbine failed to provide much of the information needed by Jolt.

20. On March 18, 2005, and at numerous other times, Turbine waived Jolt's obligation to complete the billing migration by August 26, 2005.

21. For several months after Turbine's waiver of Jolt's obligation to complete the billing migration, the parties discussed amending the Agreement to reflect the waiver and change in billing management. Although an amendment document was drafted in April 2005, for this purpose, the document was never executed.

22. The commercial launch of AC2 occurred prior to the first anniversary of the Agreement. Jolt performed all of its obligations to prepare for and implement the commercial launch of AC1 prior to the first anniversary of the Agreement. In performing its obligations under the Agreement, Jolt made significant expenditures of time and money.

23. By facsimile dated August 25, 2005, Turbine served its so-called Notice of Termination ("Notice") letter, effective December 25, 2005, based upon Jolt's purported failure to complete the billing migration on or before the first anniversary date.

24. The Notice further stated that Turbine was concerned about Jolt's financial condition and wanted to terminate the Agreement.

25. The Notice made no claim or assertion that Jolt was in material breach of the Agreement.

26. Prior to serving the Notice, Turbine made no inquiries of Jolt as to its financial condition. Had Turbine made such inquiries, Jolt would have shown that it was, and presently still is, financially stable and capable of meeting its obligations under the Agreement.

27. The Termination Clause of the Agreement, ¶12, allowed for either Jolt or Turbine to terminate the Agreement by notice in the event of a material breach or the insolvency of the other party.

28. The Termination Clause also allowed termination by Turbine upon written notice for convenience, ¶12.2.

29. Any termination for convenience, under ¶12.2, required Turbine to: i) provide a six-month phase-out period; and ii) pay an early termination fee in the event termination occurred prior to August 26, 2007.

30. Turbine's Notice purported termination on the basis of Jolt's alleged failure to complete the billing migration by August 25, 2005, and Jolt's alleged insolvency, were used as shams to avoid meeting Turbine's obligations to Jolt.

31. Almost immediately after service of the Notice, Turbine made a public announcement that it was ceasing service globally for AC2.

32. The Notice was merely a pretext for Turbine's business decision to terminate service globally for AC2, and to avoid liability to Jolt for its losses resulting from the termination of service.

33. Assuming, *arguendo*, that the Notice constituted a notice of termination for convenience, Turbine has failed to provide the six-month phase-out period and to pay the early termination fee to Jolt, as required under ¶12.2 of the Agreement.

34. Jolt has at all relevant times been in compliance with all material aspects of the Agreement.

## COUNT I
### Breach of Contract

35. Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 34.

36. The Agreement constitutes a valid, binding contract between Jolt and Turbine.

37. The Agreement was supported by good and valid consideration.

38.  Turbine breached the Agreement by serving its so-called Notice of Termination letter on August 25, 2005, despite its prior wavier of Jolt's obligation to complete the billing migration and based on the false and unsupported premise that Jolt was insolvent.

39.  The Notice of Termination is null and void *ab initio*.

40.  Assuming, *arguendo*, that Turbine terminated the Agreement for convenience, Turbine has breached the Agreement by refusing to pay the termination fee, and refusing to provide a six month phase-out period.

41.  Turbine is in breach of contract, express and implied. As a result of that breach, Jolt has suffered damages in a sum not yet ascertained, but in excess of $75,000.00.

## COUNT II
## Breach of Implied Covenant of Good Faith and Fair Dealing

42.  Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 41.

43.  Throughout its dealings with Jolt, Turbine had an implied obligation to act in good faith and with fair dealing.

44.  Turbine's conduct, including without limitation its unsupported claim that Jolt may have been insolvent, its purported termination despite its prior waiver, its public announcement that it was terminating its global services, and its attempt to shorten the Agreement's phase-out period, and its refusal to pay a termination fee constitute violations of that obligation of good faith and fair dealing.

45.  Turbine has breached the implied covenant of good faith and fair dealing owed to Jolt and by reason thereof, is liable to Jolt for the remaining amounts due and owing under the Agreement, plus interest, costs and reasonable attorneys' fees.

## COUNT III
## Unjust Enrichment

46. Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 45.

47. Jolt bestowed a benefit upon Turbine by virtue of marketing and operating its online computer games throughout Europe, and any resulting profits. Jolt has paid substantial fees to Turbine.

48. Turbine knowingly accepted the benefits of Jolt's efforts.

49. Turbine has been unjustly enriched by its improper termination of the Agreement and its failure to pay the remaining amounts due and owing under the Agreement.

50. As a direct and proximate result of Turbine's actions, Jolt has suffered damage for which Turbine is liable.

## COUNT IV
## Quasi-Contract (Breach of an Oral Agreement)

51. Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 50.

52. Turbine orally represented to Jolt that it would manage the billing for both AC1 and AC2, thereby modifying the date by which Jolt was to complete the billing migration.

53. Turbine breached its oral agreement to Jolt with respect to the billing migration.

54. Accordingly, as a result of said breach, Turbine is liable for the remaining amounts due and owing under the Agreement, plus interest, costs and reasonable attorneys' fees.

981744v5

## COUNT V
### Fraudulent Inducement

55. Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 54.

56. Turbine made statements and representations regarding the billing migration and its subscriber base of between 5,000 and 10,000 subscribers in Europe, hereinbefore alleged in this Complaint, as statements of fact which Turbine knew were false, should have known were false when made, and which were made negligently, intentionally and/or recklessly. Turbine's conduct amounts to material and intentional misrepresentations.

57. Turbine made those statements and representations regarding the billing migration and their subscriber base both willfully and knowingly for the purpose of inducing Jolt to rely on them. Turbine did not inform Jolt that its statements and representations were false prior to the time the Agreement was executed. Jolt, in turn, relied upon Turbine's statements and representations as being true, and it did so rely to its detriment.

58. As a direct and proximate result, Turbine is liable to Jolt in fraud and deceit as a result of the said intentional and material misrepresentations for the damages Turbine has caused Jolt to incur and which they continue to incur, plus interest, costs and reasonable attorneys' fees.

## COUNT VI
### In Equity for Reliance

59. Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 58.

60.  Turbine expected, or should have reasonably expected, that Turbine's statements or representations regarding the billing migration, including the waiver, would induce Jolt to continue to focus on the upcoming commercial launch by August 26, 2005 and not the billing migration.

61.  In reasonably relying on those representations to its detriment, Jolt has suffered damages for which Turbine is liable.

### COUNT VII
### Repudation of Contract

62.  Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 61.

63.  The Agreement constitutes a valid, binding contract between Jolt and Turbine.

64.  The Agreement was supported by good and valid consideration.

65.  Almost immediately after Turbine served its Notice of Termination, it made a public announcement that it was ceasing global service for AC1 and AC2.

66.  The Notice of Termination was merely a pretext for Turbine's business decision to terminate global service for AC1 and AC2.

67.  Turbine's refusal to provide service and global support for AC1 and AC2 constitutes a repudiation of its obligation to perform under the Agreement.

68.  As a result of this separate breach of the Agreement, Jolt is entitled to recover the benefit of the bargain including, without limitation, lost profits during the term of the Agreement.

## COUNT VIII
### Violation of M.G.L. c.93A

69. Jolt hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 68.

70. At all relevant times, Turbine conducted trade or commerce in the Commonwealth of Massachusetts so as to come within the purview of Massachusetts General Laws, Chapter 93A.

71. By the above-stated conduct, Turbine has committed unfair trade practices in violation of M.G.L. c. 93A, §11, and as a direct result thereof, Jolt has incurred monetary damages.

72. Turbine's actions were undertaken knowingly and willfully, and were primarily and substantially undertaken within the Commonwealth of Massachusetts.

73. Accordingly, Turbine is liable to Jolt for treble the amount of monetary damages it has caused Jolt to incur, plus interest, costs and reasonable attorneys' fees.

**WHEREFORE**, the Plaintiff, Jolt Online Gaming Limited, asks this Honorable Court to enter a judgment against the Defendant, Turbine Entertainment Software Corporation, n/k/a Turbine, Inc., as follows:

A. Pursuant to Counts I, II, III and IV, judgment against the Defendant, Turbine, for the remaining amounts due and owing under the Agreement, plus interest, costs and reasonable attorneys' fees, including all fees incurred in prosecuting this Complaint;

B. Pursuant to Count V and VI, judgment against the Defendant, Turbine, for damages it has caused Jolt to incur, plus interest, costs and reasonable attorneys' fees;

C.  Pursuant to Count VII, judgment against the Defendant, Turbine, for treble the amount of damage it has caused Jolt to incur, pursuant to M.G.L. Chapter 93A, plus interest, costs and attorneys' fees; and

D.  Such other and further relief as this Court may deem just and equitable.

### Demand for Jury Trial

The Plaintiff hereby demands a trial by jury on all issues so triable.

**JOLT ONLINE GAMING LIMITED,**

By its attorneys,

Dated: 2/23/06

Charles A. Cook (BBO# 097580)
Jill K. Hauff (BBO# 653886)
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500

12

981744v5